IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| PETER W. KARRAS, | ) |
| | ) Case No. 6:05cv00031 |
| Plaintiff, | ) |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| FIRST COLONY LIFE INSURANCE | ) |
| COMPANY PENSION PLAN, et al., | ) By: Jackson L. Kiser |
| | ) Senior United States District Judge |
| Defendants. | ) |

Before me are Motions for Summary Judgment filed by Plaintiff Peter W. Karras ("Plaintiff") and Defendants First Colony Life Insurance Company, First Colony Life Insurance Company Pension Plan, First Colony Life Insurance Company Supplemental Benefits Plan, and Genworth Financial, Inc. (collectively "Defendants"). The parties have briefed the issues and oral argument was held on March 17, 2006. The motions are therefore ripe for decision. For the reasons below, I will **GRANT** Defendants' Motion for Summary Judgment and I will **DENY** Plaintiff's Motion for Summary Judgment.

## I. PROCEDURAL HISTORY

On January 16, 2003, Plaintiff filed suit in this Court (*See*, 2005 WL 1712878 hereinafter abbreviated "*Karras I*") seeking to have his pension recalculated to include an $800,000 non-compete payment and the $964,769.13 in stock option proceeds. This Court granted summary judgment to Defendants as to the non-compete payment but remanded the issue of the stock options to the Plan Administrator because of an incomplete administrative record. After reviewing Plaintiff's claim at multiple meetings, involving outside legal advice, and engaging an

1

independent pension consultant, the Pension Committee voted unanimously to deny Plaintiff's claim on April 8, 2005. Plaintiff then filed this suit on August 5, 2005. After submitting the Administrative Record, both parties filed motions for summary judgment on February 3, 2006. Each party filed its brief in opposition on February 17, 2006 and the parties filed their respective reply briefs on March 3, 2006. Oral argument was heard on both motions in Roanoke on March 17, 2006. After oral argument, on March 28, 2006, Plaintiff filed a supplemental brief to support its motion. Defendants filed their brief in opposition to Plaintiff's supplemental brief on April 3, 2006.

## II. STATEMENT OF FACTS

Plaintiff worked for Defendant First Colony Life Insurance Company ("FCLIC") until he retired on April 18, 1997. When he retired, Plaintiff was a Senior Executive Vice President; he had also served as the Secretary/Treasurer for First Colony Corporation ("FCC") which was dissolved and merged into FCLIC on December 31, 1996. FCLIC maintained two pension plans for its employees. The first is the FCLIC Pension Plan ("the Plan" or "the General Plan") which is a qualified defined benefit plan governed by the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001, *et. seq*. The second is the FCLIC Supplemental Benefits Plan ("the Supplemental Plan") which is a non-qualified and unfunded plan. Both parties agree that the disputed "non-qualified" stock options which are the sole issue in this case must fit within the Supplemental Plan, if they apply at all.

Both plans utilize the same formula to calculate benefits, the same definition of "Compensation," and the same claims procedures. (Administrative Record, p. 0167). The formula for determining benefits entails a calculation of a participant's Final Average

2

Compensation, defined under the Plan as "one third of the Compensation received by the Participant during the three consecutive calendar years out of the last ten consecutive calendar years immediately preceding such date." "Compensation" is defined as "total earnings for services as reported on Internal Revenue Service Form W-2, excluding one-half (½) of incentive bonuses, other bonuses, similar payments from an Employer, any imputed income, [and] any severance or final vacation pay." (Administrative Record, p. 0049).

Plaintiff was a participant in both the General Plan and the Supplemental Plan. Plaintiff was also a member of the Pension Committee and served as Trustee of the Pension Plan during his employment with FCLIC. By December of 1996, Plaintiff had amassed options on 93,430 shares of FCC stock which he exercised on December 1, 1996. Plaintiff realized $964,769.13 as a result of the sale of this stock and this amount was included on his 1996 W-2 form. Plaintiff's W-2 stated that he earned $1,795,696.86 in "wages, tips, and other compensation" for 1996.

On April 18, 1997, the date of his retirement, the Plan Administrator issued Plaintiff a certified and peer-reviewed benefit calculation specifying his benefits. The calculation included Plaintiff's "Compensation" from 1994, 1995, and 1996, and did not include Plaintiff's 1996 stock options as pensionable earnings. No other retiree of FCLIC had had their stock options included in their pension calculation, however Plaintiff was the first retiree who had "non-qualified" stock options. The sole issue for this Court to decide is whether the non-qualified stock options should be included in Plaintiff's pension calculation.

## III. LEGAL STANDARD

### A. *Summary Judgment*

3

Summary judgment is appropriate where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987). Nevertheless, where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### B. ERISA Standard of Review

The general principle in reviewing the final decisions of ERISA administrators is that they must be reviewed *de novo* "by looking to the terms of the plan and other manifestations of the parties' intent." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989). However, "when a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." *Colucci v. AGFA Corp. Severance Pay Plan*, 431 F.3d

4

170, (4th Cir. 2005) (citing *Firestone*, 489 U.S. at 111). When this is true, as it is in this case, a court will not disturb an administrator's decision so long as it is reasonable. *See, Firestone*, 489 U.S. at 111. "This is because the plan, in conferring discretion on a trustee with respect to a specific matter, deliberately yields to the trustee's judgment on that matter, as long as it is reasonable. The plan thus recognizes that on such a matter, various reasonable decisions and interpretations could be made, and it accepts, as a contractual term of the plan, the range of decisions a trustee could reasonably make." *Colucci*, 431 F.3d at 176. (citing *Firestone*, 489 U.S. at 111). For this reason, I must reject Plaintiff's argument that I adopt a *de novo* standard of review in this case.

A preliminary issue in this case centers on how much deference this Court should give to the Pension Committee's decision to deny Plaintiff's appeal. In *Karras I*, I utilized the modified abuse of discretion standard because Defendants "both fund[ed] the Plan and act[ed] as plan administrator." *Karras I*, at *3. Defendants argue that a recent Fourth Circuit case which was decided after I decided *Karras I* requires me to adopt the general abuse of discretion standard. *Colucci*, 431 F.3d 170. I need not address this argument because, for the reasons stated in Part IV, below, Defendants would be entitled to summary judgment even under the modified abuse of discretion standard upon which I relied in *Karras I*. Therefore, I will assume, without deciding, that the conditions giving rise to an abstract conflict of interest did exist and, as such, the modified abuse of discretion is the appropriate standard of review.

## IV.  DISCUSSION

### A.  *Statute of Limitations*

In their Motion for Summary Judgment, Defendants once again raise the argument that

5

the statute of limitations bars Plaintiff's lawsuit. I rejected this argument in *Karras I* because Plaintiff filed a formal claim with Defendants regarding the exclusion of his stock options proceeds which was formally denied within five years of him filing suit. *Karras I*, at *3. The Supreme Court has held that in evaluating ERISA claims, courts must apply the most analogous state statute of limitations which, in Virginia, is the five-year statute of limitations for a breach of a written contract. *Board of Regents v. Tomanio*, 446 U.S. 478 483-84 (1980); Va. Code. Ann. § 8.01-246(2). The Fourth Circuit has also held that an ERISA cause of action accrues when a claim of benefits has been made and formally denied. *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir. 1989). Thus, because Plaintiff's filed suit within five years of Defendants' formal denial, the statute of limitations does not bar his suit.

B.  *Non-Qualified Stock Options*

The Fourth Circuit has outlined an inexhaustive list of eight factors that courts should use in "determining the reasonableness of a fiduciary's discretionary decision." *Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). The factors are:

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Id.*, at 342-43.

I find these *Booth* factors instructive in the resolution of the present case and will discuss each in turn.

### 1. The Language of the Plan

The Supreme Court has stated that the determinative facts in an ERISA case, that is, "the validity of a claim to benefits" hinges on "the terms in the plan at issue." *Firestone*, 489 U.S. at 115. In this case, the key term at issue is "Compensation." As stated in Part II, above, both the Plan and the Supplemental Plan define "Compensation" as the "total earnings for services as reported on Internal Revenue Service Form W-2, excluding one-half (½) of incentive bonuses, other bonuses, similar payments from an Employer, any imputed income, [and] any severance or final vacation pay." (Administrative Record, p. 0049). Defendants argue that the Plan Administrator did not abuse its discretion by finding that the non-qualified stock options fit within the definition of "other bonuses" or "similar payments." The Plan Administrator reasoned that the almost $1,000,000 that Plaintiff would realize from exercising his non-qualified stock options was highly similar to a "long-term performance-type bonus" and, as such, should not be considered pensionable earnings. (Administrative Record, p. 0497).

In response, Plaintiff relies upon several arguments. First, he asserts that the non-qualified stock options do fit within the core definition of "Compensation" and the Plan Administrator abused its discretion by ruling to the contrary. In support of this contention, Plaintiff argues that the definition of "Wages" in the Internal Revenue Code (IRC), as well as the corresponding Treasury Regulations, is equivalent to the Plans' definition of "Compensation" and that both the IRC and the Regulations consider stock options to be "Wages." *See*, 26 U.S.C. § 3401(a); 26 C.F.R. § 31.3401(a)-(1)(a)(2)-(4). Second, Plaintiff argues that because stock options were not explicitly excluded from the definition of "Compensation" while other types of payments like bonuses were, it should be presumed that the drafters intended to include stock

7

options in a retiree's pension calculation. Indeed, elsewhere in the Plan, stock options and bonuses are discussed distinctly which shows that the drafters were consciously distinguishing between the two types of payments. Not including stock options as one of the exceptions to "Compensation" was thus a conscious act by the drafters and the Plan Administrator must be bound by that intent. Finally, Plaintiff states that the canon of construction *ejusdem generis* requires that the "similar payments" exception be read to exclude stock options. This is because the general words of "similar payments" are preceded by the specific words, "incentive bonuses" and "other bonuses." Thus, "similar payments" must be limited to payments that are similar to bonuses and, because stock options have been distinguished from bonuses in the Plan, stock options cannot fit within the "similar payments" exception as the Plan Administrator ruled.

While Plaintiff's arguments are creative and seem persuasive at first glance, a common sense review of the Plan Administrator's ruling leads me to the inescapable conclusion that the language of the Plan supports Defendants' position. For instance, it is beside the point to argue that IRC and Treasury Regulations are equivalent to the Plans' definition of "Compensation." There is no dispute that the amount realized from Plaintiff's non-qualified stock options would be considered wages for W-2 purposes, the pertinent question is what portion of his W-2 income constitutes "Compensation" as defined by the Plans. On this issue, the IRC and Treasury Regulations cited by Plaintiff are not helpful. Similarly, it is of no real consequence that the Plans failed to explicitly exclude stock options from the list of exceptions. Courts within the Fourth Circuit have routinely held that a plan administrator's decision to exclude stock option proceeds was reasonable even though stock options were not explicitly excluded from the plan's terms. *See, Scipio v. United Bankshares, Inc.*, 119 Fed.Appx. 431 (4th Cir. Dec. 22, 2004).

Third, Plaintiff's resort to canons of construction is simply unavailing because it runs counter to the mandate of both the Supreme Court and the Fourth Circuit that "courts [should] defer to the administrator's interpretation" when that interpretation is reasonable. *Colucci*, 431 F.3d at 176; *See also, Firestone*, 489 U.S. at 111. In other words, while canons of construction are helpful to a court that is interpreting an issue *de novo*, they are decidedly less persuasive when a court is reviewing a case on a modified abuse of discretion standard such as here. Thus, in short, there is no persuasive evidence in the Administrative Record, even considering any potential conflict of interest by the Plan Administrator, that points to any conclusion other than that the Plan Administrator made one of many acceptable "reasonable decisions and interpretations" of the Plan's language by giving substantive meaning to the contested terms in the way it did. *Id*.

### 2. The Purposes and Goals of the Plan

Defendants argue that the purposes and goals of the Plans are to provide a percentage of a participant's income as a retirement pension. (Administrative Record, pp. 0495-0500). This is both an intuitive and reasonable goal for pension plans in general. Pension plans are simply not normally created in such a way that a retiree's annual pension would exceed the highest annual salary that the retiree ever earned while working. In this case, Plaintiff's highest annual compensation was roughly $320,000 which he earned in 1996. If the non-qualified stock options are not included in his pension calculation, his annual pension would be roughly $175,000. If the non-qualified stock options are included in his pension calculation, his annual pension would soar to nearly $326,000. *See, Scipio*, 119 Fed.Appx. at 437 (Fourth Circuit noting that adopting plaintiff's position to include non-qualified stock options as pensionable income would have resulted in an annual pension greater than the highest salary plaintiff earned while working).

9

Bearing in mind the deferential standard or review and seeing no evidence that this goal of the Plans could be the product of a conflict of interest, it is difficult to comprehend how the purposes and goals of the Supplemental Plan could sanction any other calculation.

Plaintiff argues that the purpose of the Supplemental Plan is to provide deferred compensation to a select group of management and highly compensated employees. To that end, the Supplemental Plan was designed to compensate these employees in the form of pension benefits without the statutory restrictions that ERISA places on the General Plan. That being the case, Plaintiff argues that Defendants' calculation of his base salary has been artificially lowered because it does not take his bonuses, vacation pay, and imputed income into account. This argument is flawed because bonuses, vacation pay, and imputed income are excluded from the calculation of "Compensation" for retirement purposes while base salary is not. It seems entirely reasonable for the Plan Administrator to have compared Plaintiff's base salary while working to his retirement pay because base salary is essentially what Plaintiff's retirement pay is determined by. Again, I cannot say that this comparison by the Plan Administrator was an abuse of discretion, the product of a conflict of interest, or both.

### 3. The Adequacy of the Materials Considered to Make the Decision and the Degree to Which They Support it

The parties do not seem to dispute the fact that adequate materials were gathered during the Plan Administrator's analysis of Plaintiff's claim. The Administrative Record is 500 pages in length and the Plan Administrator and the Plaintiff appear to have worked together in creating the record to their respective satisfaction. Plaintiff does, however, argue that the Plan Administrator's decision was not supported by the materials it considered and, in fact, simply engaged in results-based reasoning by ignoring the documents provided by Plaintiff and relying

10

instead on speculation and "oracular" statements (Plaintiff's Brief in Opposition, p. 12). In support of this argument, Plaintiff himself merely makes broad and sweeping assertions such as his statement that the Plan Administrator "made no effort to investigate the settlor's original intent." *Id.* Without a more particular showing of how the documents relied upon were misinterpreted, I am loath to find an abuse of discretion in the Plan Administrator's use of, and reliance on, the documents in the Administrative Record, especially when Plaintiff submitted many of those documents.

### 4. Whether the Fiduciary's Interpretation was Consistent with Other Provisions in the Plan and with Earlier Interpretations of the Plan

This *Booth* factor is somewhat less helpful in resolving this case because both parties agree that Plaintiff was the first person to retire from Defendants' company with non-qualified stock options. As such, it is difficult to determine if the Plan Administrator's decision in this case was consistent with earlier interpretations because no previous interpretation dealt with non-qualified stock options. However, some guidance can be gleaned from two facts. First, it is undisputed that the Supplemental Plan expressly adopts the terms of the General Plan. (Administrative Record, p. 0167). Second, it is undisputed that none of the approximately fifty rank-and-file employees who had retired before Plaintiff had had their qualified stock options included in their pension calculation under the General Plan. Based on these two undisputed facts, the Plan Administrator found it appropriate to interpret the terms of the General Plan the same as the terms of the Supplemental Plan. To give different meaning to the same words would be confusing and could become highly impractical in cases of retirees who would receive benefits under both Plans. In addition, reading words differently depending on the Plan could also lead to discrimination in favor of highly compensated employees in violation of 26 U.S.C. §

11

401(a)(4). To the extent that the Plan Administrator chose to interpret the Supplemental Plan in a fashion that would eliminate both of these concerns, it acted in a manner consistent with previous decisions.

In response to this argument, Plaintiff states that the terms of each Plan should have been treated differently because qualified and non-qualified stock options were historically treated differently. For instance, qualified and non-qualified stock options are awarded for different purposes, given to different sets of employees, and have different tax consequences when exercised. These distinctions, while apparently true, are not helpful in determining whether non-qualified stock options should be treated differently in pension calculations. These distinctions do not clarify why non-qualified and qualified stock options should be treated differently in calculating Plaintiff's pension.

Lastly, and of some relevance to this factor, another high-level executive of Defendants', Ronald Dolan ("Dolan"), did not have non-qualified stock options included in his pension calculation. While Dolan retired one year after Plaintiff, his pension benefit was calculated before Plaintiff raised the issue of including his non-qualified stock options. Thus, argue Defendants, it was reasonable for the Plan Administrator to take Dolan's pension calculation into account when it considered Plaintiff's request to alter his pension calculation. At the very least, Dolan's calculation shows that the Plan Administrator has consistently not included non-qualified stock options for those who retired after Plaintiff and before Plaintiff began this litigation. This goes to both the reasonableness of the Plan Administrator's decision and the lack of a conflict of interest by the Plan Administrator. For all these reasons, this factor weighs in favor of Defendants.

### 5. Whether the Decisionmaking Process was Reasoned and Principled

Plaintiff argues that the Plan Administrator's decisionmaking process was neither reasoned nor principled because when Plaintiff originally brought the issue of non-qualified stock options to its attention, the Plan Administrator failed to follow the proper claim and appeal procedures specified in the Plans and ERISA. This was the basis for remanding this aspect of the case to the Plan Administrator in *Karras I*. Then, after remand, the Plan Administrator ignored Plaintiff's submissions and denied his claim again. Plaintiff also argues that the independent pension consultant hired by the Plan Administrator simply calculated Plaintiff's pension by using a formula and numbers provided by Defendants. Finally, Plaintiff asserts that the outside legal counsel hired by Defendants did not address either the settlor's original intent or how to evaluate the terms of the Plans. Plaintiff's assertions are without merit.

First, without other specific evidence to the contrary, the fact that the Plan Administrator reached the same conclusion regarding the treatment of Plaintiff's stock options both before and after remand does not show bad faith. Plaintiff's other conclusory allegation that the independent pension consultant merely ran the numbers that the Defendants gave him is likewise unpersuasive. The fact that the consultant considered the same facts and reached the same conclusion in his peer-reviewed estimate of Plaintiff's pension calculation as did the Plan Administrator does not make the decisionmaking process unreasoned or unprincipled. Given the deferential standard of review that I must employ and the lack of specific evidence to substantiate Plaintiff's allegation, I cannot say that the pension consultant was anything but independent. Similarly, the fact that the Plan Administrator hired and relied upon outside legal counsel bolsters its final conclusion. The fact that counsel did not specifically address the original intent

13

of the drafters is simply no reason to dismiss the greater fact that the Plan Administrator sought outside legal advice before rendering its opinion. While the Plan Administrator did not initially follow the proper procedure for Plaintiff's case, after this Court remanded the issue in *Karras I*, the Plan Administrator hired both an outside pension consultant and legal counsel to make sure it reached a conclusion that was the product of a reasoned and principled analysis. No abuse of discretion can be found as to this factor.

### 6. Whether the Decision was Consistent with the Procedural and Substantive Requirements of ERISA

The Plan Administrator found that including Plaintiff's non-qualified stock options in his pension calculation could be in violation of ERISA's mandate against discriminating in favor of highly compensated employees. 26 U.S.C. § 401(a)(4). This conclusion was based on the fact that, as discussed above, the Supplemental Plan specifically adopts the terms of the General Plan and under the terms of the General Plan, qualified stock options have never been included in a retiree's pension calculation. To include non-qualified stock options under the Supplemental Plan, then, would result in one of two equally untenable results. First, the Plan Administrator could treat stock options differently under the two Plans even though they have identical terms. This would violate the Plans' express requirement that pensionable earnings be calculated under both Plans based on the same definition. (Administrative Record, p. 0167). Alternatively, non-qualified stock options could be considered pensionable earnings under both Plans. This course of action would put Defendants at risk under ERISA by interpreting the General Plan to discriminate in favor of highly-compensated employees. It was perfectly reasonable for the Plan Administrator to interpret the terms of the Plans in a manner that protected it from both future litigation and eliminated the risk of violating ERISA which could have resulted in the General

14

Plan losing its favorable tax treatment. The Plan Administrator, much less a reviewing court, cannot require Defendants to interpret its pension plans in a manner that poses a risk of litigation and disqualification under ERISA. (*accord, O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.*, 37 F.3d 55, 61 (2d Cir. 1994)). As such, this factor does not provide any basis for determining that the Plan Administrator abused its discretion.

### 7. Any External Standard Relevant to the Exercise of Discretion

Both parties argue that the IRC and its corresponding Treasury Regulations support their respective positions. *See*, 26 U.S.C. § 415(c)(3); 26 C.F.R. § 1.1415-2(d). These provisions state that for purposes of the IRC, "Compensation" does not normally include "amounts realized from the exercise of a non-qualified stock option." 26 C.F.R. § 1.1415-2(d)(3(ii); (*see also, Scipio* 119 Fed.Appx. at 437-38). While it is true that this is the default standard for the IRC, it is equally true that the numerous ERISA cases that have considered the issue of what should be considered a retiree's "Compensation" have rarely used this default definition. Rather, each plan has its own specific and carefully drafted definition of what comprises a retiree's "Compensation." The present case is no exception. For this reason I do not give great weight to the IRC's default definition and instead rely on the specific language in the Plans as more helpful to resolving this case. As a result, the sole external standard cited by the parties does not advance either of their respective causes. By the same token, it does not weigh in favor of finding an abuse of discretion.

### 8. The Fiduciary's Motives and Any Conflict of Interest it May Have

In a case such as this which is reviewed under the modified abuse of discretion standard,

15

the presence of a conflict of interest must be considered in the evaluation of each of the other seven factors. In my evaluation of the seven other *Booth* factors I have found no evidence of an actual conflict of interest by the Plan Administrator. For instance, the Plan Administrator engaged independent legal counsel and an independent pension consultant to help guide its inquiry. Similarly, the Plan Administrator interpreted the Plans' language in a manner that was both consistent with the purposes and goals of pension plans generally and in a manner that better protected the General Plan from violating ERISA's anti-discrimination law. These facts belie Plaintiff's general allegations of a conflict of interest and show, rather, a series of fully-supportable judgments made by the Plan Administrator. Even under a modified abuse of discretion standard, I cannot disturb a decision that is the product of a principled and reasoned administrative procedure. Therefore, though I analyzed this case under the modified abuse of discretion standard, my analysis has revealed no evidence of an actual conflict of interest by the Plan Administrator.

Therefore, taking all eight *Booth* factors together, there is no genuine issue of material fact to support Plaintiff's position. In denying Plaintiff's claim, the Plan Administrator acted in an objectively reasonable fashion and I will not disturb its judgment.

## IV. CONCLUSION

For the reasons stated above, the Motion for Summary Judgment filed by Plaintiff will be **DENIED**. The Motion for Summary Judgment filed by Defendants will be **GRANTED**.

The clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to all counsel of record. The clerk is further directed to strike this matter and all outstanding motions from the Court's docket.

Entered this 13th day of April, 2006.

                                              s/Jackson L. Kiser
                                              Senior United States District Judge